FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 MAR 27 PM 1:09

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| RHONDA WETZEL, BELINDA CAST, and CASAH PONDER, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.: 01-PT-2591-E ) |
| NORTH AMERICAN BUS INDUSTRIES, INC., | ) ) ) |
| Defendant. | ) ) |

ENTERED

MAR 27 2003

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant North American Bus Industries, Inc.'s ("NABI") Motion for Summary Judgment, filed on January 29, 2003.

**FACTS AND PROCEDURAL HISTORY**

NABI is a bus manufacturer with its principal production facility located in Anniston, Alabama. *See* Wetzel Depo. ("Def. Ex. A") at 49. NABI also has locations the City of Fife, Washington and the City of Delaware, Ohio, as well as in Hungary and England. *Id.* at 29, 45; Clark Depo. ("Def. Ex. D") at 18. NABI's operations are divided into separate divisions: production, management, engineering, purchasing, customer service, warranty, and an after-market parts division. *See* Def. Ex. A. at 18, 21; Cast Depo. ("Def. Ex. B") at 37-38. The after-market parts division was a completely separate part of NABI from the other divisions. *See* Def. Ex. A at 19. Prior to February 2001, NABI had three after-market parts warehouses, with one warehouse each in Fife, Delaware, and Anniston. *Id.* at 45-46. The Delaware, Ohio warehouse was the largest of the three, and was substantially larger than the Anniston warehouse. *Id.* at 82-83; Ponder Depo. ("Def. Ex. C") at 173. Each after-market parts warehouse was responsible for

30

a specific region of the country and had its own customer service and clerical personnel. *See* Def. Ex. A at 43-45, 82-83.

Plaintiffs, who are all female, were employed in the Anniston after-markets parts warehouse, which was responsible for providing replacement parts in the southeastern region of the United States. *Id.* at 21-22, 35-36, 42-45; Def. Ex. B at 38. Plaintiff Casah Ponder ("Ponder") worked as a warehouse supervisor. *See* Def. Ex. C at 104-06. Plaintiffs Belinda Cast ("Cast") and Rhonda Wetzel ("Wetzel") were customer service and clerical employees, working in the office of the warehouse. *See* Def. Ex. A at 71-72. A customer service representative is responsible for answering the telephone and generally taking orders for parts. *Id.* at 25-26. Brian Vickers ("Vickers") and Tim Burdette ("Burdette") also worked in the warehouse. Vickers and Burdette's duties were to physically pack, shop, and receive parts, maintain the inventory, and re-stock inventory. *Id.* at 37-38, 74, 200; Def. Ex. B at 31; Def. Ex. C at 81-83; Def. Ex. D at 87-88.[1] Vickers and Burdette did not perform any sales or clerical duties. *See* Def. Ex. A at 75-76, 79-80, 106-07. However, they did, on occasion, handle material for the production plant. *See* Def. Ex. C at 79, 81.

Prior to the events in question, Thorton Sanders ("Sanders"), a former president of NABI, asked Shannon Young ("Young") to hire Rick Sherman ("Sherman"), the son of Sanders' neighbor. *See* Def. Ex. D at 19-22. Young hired Sherman as southern regional manager for after-market parts sales. *Id.* at 18. The after-market parts division moved into a new facility, but began experiencing a substantial loss of inventory control. *See* Def. Ex. A at 34-35, 41, 52-54. Inventory was mislabeled and disorganized, customer orders were not filled, and sales were

---

[1] For a description of how parts and material were shipped and unloaded, see Def. Br. at 2-3.

negatively affected. *Id.* at 59, 125-29, 151-52. NABI's corporate office spent thousands of dollars and sent several corporate employees to the Anniston warehouse to help resolve the inventory problems. *Id.* at 149-51, depo. ex. 5. The problems persisted, and Sherman left NABI on less than favorable terms.

During roughly the same period, NABI began to experience substantial business growth in its production division, particularly at the Anniston production facility. *See* Def. Ex. A. at 47-49; Def. Ex. B at 62-63. According to NABI, it was common knowledge that the production facility was becoming cramped for space, and that it wanted to take over the after-market parts warehouse's space. *See* Def. Ex. C at 172-73. NABI had already been discussing a reorganization in the company, and decided that the best option would be to move the Anniston after-market parts warehouse to Ohio, thereby hopefully curing the problems in Anniston, and to allow the Anniston production division to take over the vacated warehouse space. *See* Def. Ex. A at 82-83, 116-17, 167, depo. ex. 8; Def. Ex. F at ¶ 2.; Def. Ex. D, depo. ex. 13, 16. Young and Greg Church, national sales manager for NABI, made the decision. They considered relocating the after-market parts warehouse to some other location in Alabama, but decided that this was not feasible. *See* Def. Ex. F at ¶ 2. The decision to close the Anniston after-market parts warehouse took effect in February, 2001. According to NABI, the decision was a substantial benefit to both the after-market parts division and the production division. *Id.*; Def. Ex. D, depo. exs. 13, 16.

Young asked Herb Clark ("Clark"), NABI's director of human resources who worked in Anniston, to determine if there were any jobs available for the individuals who would be displaced by the closing of the after-market parts warehouse in Anniston. *See* Def. Ex. D at 12.

3

According to NABI, all of the after-market warehouse employees were in good standing, and employee performance played no part in the decision to close the warehouse or whether Clark could place them in a new job. *See* Def. Ex. D at 12, 74, 135, 138, 210. NABI contends that Clark reviewed the plaintiffs' employment files, and then looked to see if there were any jobs at the Anniston production facility into which they could be placed. *Id.* at 12-13, 75-76. Clark found only hourly labor jobs, and did not think that these jobs would be appropriate transfer jobs for plaintiffs, who were salaried and/or clerical employees. *Id.* at 61-62. There were no clerical openings. NABI contends that it was not its practice to transfer a displaced clerical or supervisory employee into an entry-level laborer, mechanical, or temporary job. *Id.* at 89-90, 92-93, 212-13, 218-19. However, Clark did not ask plaintiffs if they would be interested in these types of positions. *Id.* at 62. Clark did determine that Vickers and Burdette, the material handlers, could be retained in their current positions, which would include packaging and shipping the remaining parts inventory to Ohio, shipping newly received parts to Ohio, and handling materials for warranty service at the production facility. *Id.* at 145, 193; Def. Ex. G at 8.

On February 21, 2001, several of NABI's representatives met with the after-market parts warehouse employees, including plaintiffs, and informed them that the warehouse was going to close. *See* Def. Ex. A at 91-94, 109; Def. Ex. C at 21-23.[2] Young told Ponder and Wetzel that their jobs were being eliminated immediately. *See* Def. Ex. C at 23-24. After the meeting, Clark and Church met with Wetzel alone in her office. *See* Def. Ex. A at 96. According to NABI,

---

[2]Cast was not present, but was informed later. *See* Def. Ex. B at 43-46.

4

there was some discussion about offering Wetzel a position in Ohio,[3] but Wetzel stated that moving to Ohio was not an option for her. *See* Def. Ex. A at 101-102; Def. Ex. B at 46-47; Def. Ex. D at 77-80. Wetzel testified that she could not recall if she made that statement or not. *See* Def. Ex. A at 101. Young stated that it was his understanding that Wetzel was not interested in moving to Ohio, so he offered the job to another female applicant. *See* Def. Ex. F at ¶ 3. Young offered Wetzel a severance package instead, which she ultimately rejected. *See* Def. Ex. A at 97. NABI contends that Ponder and Cast's jobs were already being performed by persons in Ohio.

By contrast, Burdette and Vickers were not immediately terminated.[4] As noted above, Burdette was retained to pack and ship parts to be sent from the Alabama warehouse to Ohio. *See* Def. Ex. F at ¶ 4. NABI contends that once this process was complete, it was going to decide whether to retain Burdette or eliminate his position also. *Id.* However, Burdette resigned before that determination was made. *Id.* Vickers remained in his materials handling job and was supervised by someone in Anniston until he resigned in March 2002. *Id.* at ¶ 5. NABI notes that even after the warehouse was relocated to Ohio, some parts were still received or procured from Alabama. *Id.* NABI contends that Young never considered displacing Vickers or Burdette and replacing them with plaintiffs. *Id.* NABI does not have a policy that provides for such "bumping" of employees. *Id.* NABI also notes that Cast and Ponder admitted that the production division would still receive parts. *See* Def. Ex. B at 60-62; Def. Ex. C at 89-90. *See also* Def. Ex. G at 9. Plaintiffs counter by alleging that Hamilton told Ponder that Vickers was told by a company manager that he (Vickers) would be taken care of because he was getting

---

[3]Wetzel apparently remembers the conversation differently than NABI. *See* Def. Ex. A at 101.

[4]There was also a temporary employee working in the after-market parts warehouse named Kenneth Hamilton. According to plaintiffs, he too was given the option to remain employed. *See* Pl. Ex. 2 at ¶ 11.

married soon. *See* Pl. Ex. 2 at ¶ 11.[5]

Plaintiffs assert that a few days after terminating them, NABI hired nine (9) new employees for the positions of Mechanical Assemblers in the Anniston production facility, eight (8) of which were men. *See* Def. Ex. H at 5. Plaintiffs all assert that they were qualified for these positions. *See* Pl. Ex. 1 at ¶ 9; Pl. Ex. 2 at ¶¶ 14-15. Also, plaintiffs note, during the month of February 2001, the month in which the reduction in force took place, NABI hired twenty-seven (27) employees, twenty-five of whom were men. *See* Def. Ex. H at 4-5. Ponder notes that one of the positions was material handler, which she asserts is a job with responsibilities similar to those of a warehouse supervisor. *See* Pl. Ex. 2 at ¶¶ 4-5.

Plaintiffs also point to the March 12, 2001 hiring of Don Phillips as logistics manager. *See* Def. Ex. D at 61. According to plaintiffs, Clark understood that the position involved transport of parts of inventory to the facility. *Id.* at 67. Wetzel asserts that she was qualified for this position, as she had worked, in various capacities, with the inventory system before. *See* Pl. Ex. 1 at ¶ 14. However, Clark conceded that Wetzel was not considered for this position, *see* Def. Ex. D at 66-67, despite his prior knowledge that the after-market parts warehouse would be closing. *See* Def. Ex. D, depo. ex. 16. Plaintiffs also assert that Ponder was qualified for the position as well. *See* Pl. Ex. 2 at ¶ 9.

According to NABI, plaintiffs never expressed any interest in continued employment with NABI. *See* Def. Ex. D at 83-84. All three were eligible for rehire, and NABI asserts that all job openings were posted and/or advertised, but none of the plaintiffs ever expressed an interest in further employment at NABI. *Id.* at 206-08. Specifically, Wetzel stated that she was

---

[5]NABI has filed a motion to strike (Doc. 27), arguing that this paragraph of Ponder's declaration is hearsay.

not aware of any vacant positions for which she was qualified for at the time the reduction in force occurred, and she admitted that she did not apply for any open positions once she left. *Id.* at 87-88.[6] Wetzel stated that she does not know if anyone ever replaced her in Anniston, and she also stated that she never formally complained to anyone at NABI about how she was allegedly treated. *See* Def. Ex. A at 216-17, 219.

Cast also did not complain to anyone at NABI about what she perceived to be gender discrimination. *See* Def. Ex. B at 78. She also stated that, with the exception of NABI retaining the two male employees, she has no evidence to suggest that she was terminated because of her gender. *Id.* at 78-79.

Ponder did not apply for any open positions, even though she had been informed by Barbara Wise, a NABI representative, that she envisioned advancement opportunities for Ponder with NABI. Ponder did not follow up with Wise, even as Wise spoke with her as she cleaned out her desk. *See* Def. Ex. C at 24, 64-69.[7] Ponder also admitted that the Ohio warehouse already had a warehouse supervisor and that it did not need two. *Id.* at 28-29.

Plaintiffs point to some additional facts. Ponder asserts that in the month prior to the layoff, she was informed that her job was secure and that there was no reason for her to look for other employment. *See* Pl. Ex. 2 at ¶ 9.[8] Wetzel asserts that in May 2000, while Sherman was still employed at NABI, she complained to Young that she thought that she was encountering sex

---

[6] She did state, however, that she did not apply because she was unsure of how her application would be received, since she had already filed this lawsuit. *Id.* at 88.

[7] Ponder stated that she was in such a state of shock that she did not think to speak with Wise about other opportunities. *Id.* at 69-70.

[8] NABI has filed a motion to strike (Doc. 27), arguing that this paragraph of Ponder's declaration is hearsay.

7

discrimination in regards to her suggestions of how to fix the problems in the warehouse. *See* Def. Ex. A, depo. ex. 4. Specifically, she alleged that her suggestions were not being listened to because she was a woman. *Id.*[9] Cast asserts that she was "made aware" of comments made by managers that reflect a certain hostility toward women. She alleges that Sherman informed her that Young and Church referred to Wetzel as "an emotional female." *See* Def. Ex. B. At 16. Other comments included a statement from Wise that the "guys up north" did not think that the warehouse could be run by three female employees. *Id.* at 19.[10]

Finally, plaintiffs point to NABI's company policy on transferring employees to other positions. First, plaintiffs note, the employees in charge of implementing this policy are all male. *See* Def. Ex. D at 28, depo. exhibit 2. According to plaintiffs, Clark stated that entry-level jobs are typically not posted, because an employee already at the company would essentially be taking a step down to take that position. *Id.* at 30-33. Also, Clark stated that when an employee seeks a transfer or promotion, NABI only looks at the posted jobs in deciding whether to make that move. *Id.* However, Clark stated that NABI normally makes an exception in the event of a down-sizing or reorganization of a department, stating that "we would look within the total organization to see if there was an opportunity for them." *Id.* at 33. Plaintiffs contend that Clark did not consider them for any of the positions that were ultimate filled after their terminations, even though they were qualified to fill these positions. *See* Def. Ex. D at 66-67; Pl. Ex. 1 at ¶¶ 4, 11; Pl. Ex. 2 at ¶ 4.

Plaintiffs filed this complaint on October 12, 2001. The allege that they were

---

[9]For NABI's version of these events, *see* Def. Br. at 6-9.

[10]NABI has filed a motion to strike (Doc. 27), arguing that these portions of Ponder's deposition are hearsay.

discriminated against because of their gender, in violation of 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981a. Specifically, they allege that NABI discriminated against them by terminating their employment while retaining the two male employees, Vickers and Burdette. NABI now seeks summary judgment against all three plaintiffs.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Defendant's Position

NABI notes that this case involves a reduction in force, not a termination based on misconduct or poor performance. NABI cites *Bibby v. Drummond Co., Inc.*, 818 F. Supp. 325 (N.D. Ala. 1993), *aff'd* 20 F.3d 1174 (11th Cir. 1994), in which this court stated that

> [T]his court recognizes that a RIF is sometimes an undesirable business necessity. Terminating employees who are serving in a satisfactory manner, and who may have been with a particular company for an extended period of time can be extremely difficult, and can lead to hard feelings and a sense of resentment. However, such actions are sometimes required in the business world. The courtroom cannot take the place of the boardroom in determining how, where, when, and why a RIF should occur.

*Id.* at 330. Thus, NABI argues, it had the prerogative to implement a more efficient way to warehouse its after-market parts.

NABI also cites *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000), in which the court stated that

> When a plaintiff alleges disparate treatment, liability depends on whether the protected trait . . . actually motivated the employer's decision. That is, the plaintiff's sex must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2105, 147 L. Ed.2d 105 (2000) (internal marks and citations omitted).

*Id.* at 1024-25 (discussing claims under the ADEA). NABI acknowledges that a plaintiff can establish intent using either direct or circumstantial evidence. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). However, NABI argues, neither is present in this case.

NABI argues that direct evidence is "evidence which affects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Damon*, 196 F.3d at 1358 (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [prohibited basis] will constitute direct evidence of discrimination." *Id.* at 1359. Here, NABI argues, plaintiffs have not identified any statement or comments that would constitute direct evidence. Plaintiffs have pointed to certain statements that NABI argues are hearsay, but even those statements, NABI contends, do not constitute direct evidence.

As to circumstantial evidence, NABI notes that in a reduction in force case, the traditional *McDonnell Douglas* test is slightly modified. NABI argues that plaintiffs must show (1) that they were in a protected group and were adversely affected by an employment decision; (2) that they were qualified for their current position or to assume another position at the time of discharge or demotion; and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of sex in reaching the decision at issue. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990). NABI argues that the Eleventh Circuit has interpreted the second prong to mean that the plaintiff must "appl[y] for a job for which she is qualified and which is available at the time of her termination." *Jameson v. Arrow Co.*, 73 F.3d 1528, 1533 (11th Cir. 1996). The terminated employee "must be

11

considered for that job along with all other candidates, and cannot be denied the position based upon" her sex. *Id.* at 1533. NABI then discusses the shifting burdens of production and persuasion under *McDonnell Douglas*. *See* Def. Br. at 26-28.

NABI contends that plaintiffs have admitted that they did not apply for any vacant positions after their jobs were eliminated. Thus, NABI argues, plaintiffs cannot establish a *prima facie* case, because they have neither sought nor been denied any available position. NABI also notes that "[w]here a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough." *Earley*, 907 F.2d at 1082-83. *See also Jameson*, 75 F.3d at 1532. Nor can plaintiffs argue that they should have been allowed to "bump" Vickers or Burdette. Since "[n]othing in the ADEA requires that younger employees be fired so that employees in the protected age group can be hired," *Earley*, 907 F.2d at 1083, NABI argues that Title VII does not require that male employees be terminated to allow female employees to retain their jobs. Likewise, NABI contends, an employer is not under "any added burden . . . to transfer or rehire laid-off workers in the protected . . . group as a matter of course. *Jameson*, 73 F.3d at 1533.

NABI also argues that the "same actor inference" applies in this case. *See Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1442 (11th Cir. 1998) ("Every other circuit to have reached this question has determined that, where the facts indicate that the same individual both hired and fired an employee, an inference may arise that the employers' stated justification for terminating the employee is not pretextual."). Here, Young and Church hired Ponder as warehouse supervisor in favor of two male applicants. Young had offered the job to Wetzel

before Ponder was hired. Thus, NABI argues, even if plaintiffs could establish a *prima facie* case, the same actor inference shows that no discriminatory animus was involved in the decision to eliminate their positions. *See, e.g., Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification.").[11]

Finally, NABI argues that plaintiffs cannot point to any comparators who were treated differently than they were. Plaintiffs are not similarly situated to Burdette and Vickers, as these two men were in different positions and had different responsibilities and duties. Moreover, NABI notes, it has had a reduction in workforce before, in its technical publications department. *See* Def. Ex. I at 2. In this instance, three positions were eliminated, and it happened that all three were held by males. Here, the reduction happened to affect only females. NABI argues that there is no inference of discrimination in either case.

## II. Plaintiffs' Response

Plaintiffs counter that NABI should have considered them for the entry level positions. Plaintiffs cite *Carmichael v. Birmingham Saw Works, Inc.*, 738 F.2d 1126 (11th Cir. 1984), arguing that plaintiffs can still make out a *prima facie*, even though they never applied for a position, when they show that the defendant did not provide the plaintiffs with notice that the positions were available. In *Carmichael*, the court stated that

> To require this plaintiff to demonstrate an explicit expression of interest in

---

[11] NABI also notes the history of each plaintiff with NABI, including who hired them and what promotions and/or job changes they have received. *See* Def. Br. at 6-10.

13

specific jobs would also be at odds with the purposes of the prima facie case in analyzing evidence. The *prima facie* case raises a presumption of discrimination because it eliminates the most common reasons for rejecting a job applicant: a lack of qualifications and a lack of an available job. The paradigmatic prima facie case, described in *McDonnell Douglas*, requires the plaintiff to prove that he "applied for" a job to eliminate another obvious nondiscriminatory reason: that the plaintiff was not offered the job because the company did not know he was interested. *McDonnell Douglas* "align[s] closely the prima facie case with proof of elements within the plaintiff's own objective knowledge." By showing that he applied, the plaintiff shows that the employer knew he was interested in the job. But when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not. Furthermore, when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest.

Accordingly, a plaintiff makes out a *prima facie* case--that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection--as long as he establishes that the company had some reason or duty to consider him for the post. The employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job. When the plaintiff had no notice of or opportunity to apply for the job, such a reason for rejection is "legally insufficient and illegitimate."

*Id.* at 1133-34 (citations omitted). *See also Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir. 1986).

In addition to arguing that they should have been considered for the entry level positions, plaintiffs make several other observations. First, they note that because they were laid-off, they have lost their dental insurance, health insurance, and 401(k) benefits. Presumably, they would have been allowed to keep these benefits if they had been given an entry level position. Also, Wetzel notes that she has previously taken a reduction in pay in order to move from one part of the company to another. *See* Pl. Ex. 1 at ¶ 10. As to the previous reduction in force, plaintiffs note that Clark had previously stated that he could not recall any prior reductions in force. *See* Def. Ex. D at 96. *See also* Def. Ex. G at 11. And although NABI now asserts that there was

14

another reduction in force, plaintiffs argue, it has not shown whether the employees were offered or declined other positions. Indeed, according to plaintiffs, NABI's records indicate that one of the male employees involved in the first reduction in force was retained. *See* Def. Ex. I.

Finally, plaintiffs cite *Hinson v. Clinch County*, 231 F.3d 821 (11th Cir. 2000), in which the court stated that

> A court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." "[T]he court should give credence to the 'evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" In other words, we must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not required to believe."

*Id.* at 826-27 (citations omitted). Here, plaintiffs argue, drawing all reasonable inferences in their favor precludes summary judgment.

## CONCLUSIONS OF THE COURT

The court will grant the defendant's motion. A careful consideration of the evidence reveals absolutely no substantial evidence which creates any reasonable inference of discrimination. The defendant must have some reason to think that a plaintiff is interested in a job. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1560 (11th Cir. 1986)(plaintiff can make out a *prima facie* case "as long as he establishes that the company had some reason or duty to consider him for the post"); *see also Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270 (11th Cir. 2002). Plaintiffs have not established a reasonable inference of discrimination by either direct or circumstantial evidence. The defendant has articulated substantial reasons for its actions. The plaintiffs have provided only conclusory allegations, including some inadmissable hearsay. Plaintiffs are not the victims of discrimination. They are only victims of

the closing of a warehouse for business reasons.

This \_\_\_27TH\_\_\_ day of March, 2003.

_____
**ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE**